ROSE ELLEN FOX, APPELLEE, v. SCANDINAVIAN MUTUAL AID ASSOCIATION, APPELLANT.

FILED JUNE 19, 1920.   No. 21441.

1. **Insurance: FRAUD: PROOF.** When it is sought to defeat recovery on a policy of life insurance on the ground of concealment of material facts by the insured, it is incumbent on the insurer to prove that the representations were made knowingly and with a fraudulent intent to mislead and deceive, and that they were material to the risk, and were relied on by the insurer. *Ætna Life Ins. Co. v. Rehlaender*, 68 Neb. 284.

2. ———: ———: QUESTION FOR JURY. When the question of conceal-
ment of material facts is sought to be interposed to avoid liability
on a life insurance policy, such question of concealment is one of
fact for submission to the jury.

APPEAL from the district court for Douglas county:
LEE S. ESTELLE, JUDGE. *Affirmed.*

*J. L. McPheely,* for appellant.

*Thomas Lynch, contra.*

DEAN, J.

Mrs. Rose Ellen Fox sued to recover $1,000 on a life
insurance policy issued to her daughter, Margaret
Marie, by defendant, in which Mrs. Fox was named
beneficiary. The daughter was about 22 when, on
September 25, 1915, defendant issued the policy in ques-
tion. April 18, 1916, the insured died. This is the
second appeal here. On the former appeal a judgment
for defendant on a directed verdict was reversed and
a new trial granted. *Fox v. Scandinavian Mutual Aid
Ass'n,* 103 Neb. 117. At the second trial plaintiff re-
covered a verdict and judgment for the full amount of
the policy, and defendant appealed.

In the answer it is pleaded, and among other argu-
ments in the brief it is contended, in substance: That
Mrs. Fox and her daughter conspired to deceive defend-
ant, in that they fraudulently concealed from the
agent who took the application and from the physician
who made the examination these material facts, well
knowing them to be material, namely; that the insured
was not in sound health when the application was
made; that they had knowledge of physical infirmi-
ties of the insured at the time which would tend to
shorten her life; that in October, 1913, the insured
was afflicted with tubercular trouble, and under medical
advice went to and was treated at the tuberculosis hospi-
tal at Kearney.

E. C. Sikes was defendant's agent, who, on September 20, 1915, obtained the written application for insurance from Miss Fox. At the first trial he did not testify. At the second trial he was a witness and testified on the part of defendant: "Q. In taking this application, I would ask you to state if you read the questions pro-pounded there to Margaret Marie Fox? A. Some of those questions we didn't dwell on particularly; the detail I left out usually; inquired if they were in good health, if they had ever been rejected, is my custom; farther than that, I never went into the details par-ticularly on these applications. Q. What would you say as to whether or not you asked this question: '(16) Have you been an inmate of any infirmary, sanitarium, retreat, asylum or hospital?' A. I don't recollect having asked the question; no, sir. Q. What would you say as to whether or not you asked her: '(18) Is there anything, to your knowledge or belief, in the physical condition of the family or personal history or habits, tending to shorten life?' A. I couldn't state that I positively asked that question; no, I considered it covered by the question if they were in good health, if they had ever been rejected. Q. State to the jury, in writing these answers, what you asked the applicant, Margaret Marie Fox, as to her health and her physical condition. A. My recollection was I asked her if she was in good health, if she had ever been rejected. Q. And what did she say as to her health? A. That she was."

Mr. Sikes testified on cross-examination: "Q. Now, I call your attention to several questions * * * which are as follows: 'No. 6. Have you ever applied for life insurance?' And the answer, 'No.' * * * A. I didn't consider it cut any particular figure. Q. You knew, at the time you wrote that 'No' down, that you had made her up an application for insurance yourself two years before, didn't you? A. Yes, sir. Q. You remembered that at the time? A. Sure did. * * *

Q. I call your attention to question No. 9: * * * 'When were you last examined for life insurance?' And the answer written in in ink, 'Never'? * * * A. For the same reason, I answer that question: No; it didn't cut any particular figure. Q. Well, you knew she had been examined? A. Yes. Q. You just wrote in the word 'Never'? A. Yes, sir. * * * Q. The question is, did she look strong and healthy? A. I would not say she did look strong and healthy as others do; no, sir. However, there was nothing to arouse suspicion in my mind particularly, as I had had her examined—had her—in 1913. Q. The fact that you had examined her in 1913 did influence you with regard to this application, did it? A. Not especially; but I might perhaps have been a little more inquisitive had I not gotten her a policy at that time in 1913. Q. While you were talking to the members of the family there at the Fox household, did they withdraw at any time to consult among themselves? A. No, sir. * * * Margaret Marie Fox and a young lady, the friend of this young lady, and Mrs. Fox, and young Mr. Jackson; I don't know his given name, I have forgotten. * * * It is my recollection they all stayed there.''

Defendant read from the testimony of Dr. William Curry taken at the former trial. Respecting the examination he testified: ''Q. That is, did you examine the patient at the time as to the force and volume of the pulse sitting and standing? A. I don't think that was required there. Q. Did you make the forced expansion? A. I measured the applicant on the full forced expansion and on contraction; expansion of the chest by taking a deep breath, and then a forced contraction by breathing it all out again. Q. Now, doctor, did you make any examination as to the lungs? A. Yes, sir. Q. Now, state whether it is true, or not, that by palpitation and percussion, as I understand it, and by hearing and listening, the doctor investigates? A. He does. Q. Did you do that? A. I could not say

that I did by palpitation or by percussion, but by auscultation I did. Q. As described here, doctor, question No. 7, 'What is the shape of the chest?' the word 'Normal' is written—who wrote that word 'Normal'? A. I did. * * * Q. The further question is asked: 'Is the vascular murmur clear and distinct over both lungs?' (The answer "Yes" appears in the exhibit.) Now, who wrote the answer to that? A. I did. * * * Q. Now, calling your attention to question 14, who wrote the answer to that? A. I did. Q. That is the 'first-class risk'? A. Yes, sir. * * * Q. And you believed that to be true at that time? A. Yes, sir. * * * Q. Now, the party that you examined, doctor, was there any indication in her appearance that would attract the eye of the doctor, and you there present, as to whether or not she was suffering from an ailment; that is, consumption? A. There wasn't anything that attracted my attention at that time. Q. What was the appearance of the young lady that you examined? A. She appeared to have good health. * * * Q. Doctor, was there anything in the appearance of the party you examined, when this application was signed by you, that would indicate to you in the first instance, as a doctor, that the applicant had tuberculosis or consumption? A. There wasn't anything that I observed." It may also be noted, as pointed out in the former opinion, that the doctor testified: "Q. Now, doctor, * * * you propounded the questions to the applicant at that time? A. I think I did. I always have; that was my custom to do so, and, unless there happened to be a question I knew by just seeing the applicant, or something of that kind, I would always ask the question; these I could not see without asking."

Defendant's answer "admits that the party signing the application representing herself to be Margaret Marie Fox was examined by a physician," leaving it to be inferred from the pleading and from the questions put to the doctor that some one impersonated the

insured and was examined in her stead. But his answers do not seem to so indicate. Edward Jackson was present when the doctor made the examination and testified at both trials. Except as to minor details, his evidence, which is reviewed at some length in the former opinion, is not materially different from that given at the former trial. He testified in substance that, besides himself, Marie, and the doctor, Mrs. Fox and Catherine Fox were present at the time. Clearly the question of the identity of the person examined by the doctor was for the jury. Mr. Jackson also testified that the doctor was present not to exceed 15 minutes; that he did not interrogate the insured as to her health, nor was the condition of her health talked about.

That the insured was an inmate of the state tubercular hospital for a period of 10 or 12 months is not controverted, but there is testimony in support of plaintiff's theory that a recovery was had. Clearly the doctor's diagnosis supports plaintiff's theory in respect of recovery as disclosed by his own evidence, unless indeed he is mistaken about having made an examination, as he testifield with respect to chest expansion and chest normality, vascular lung murmur, and the like. It may also be noted that he testified that an examination as to pulse force and volume did not seem to be necessary. Assuming, then, that the examination was made, it is clear that his conclusion on these points was the result of his own examination, based upon professional knowledge, and not on the answers of the insured. And if after so extended a personal examination he then pronounced her a "first-class risk," and if, as he further testified, there was nothing in her appearance to indicate that she was tubercular, but was to all appearance in good health, the jury were justified in relying upon his testimony. The testimony of Mr. Sikes shows that many of the answers to material questions on the examination sheet were his answers, and not the answers of the insured. The

same observation may be made with respect to much of the doctor's examination.

The defendant pleads and argues that there was concealment of material facts by the insured. The rule is. that, when it is sought to defeat recovery on a policy of life insurance on the ground of concealment of material facts by the insured, it is incumbent on the insurer to prove that the representations were made knowingly and with a fraudulent intent to mislead and deceive, and that they were material to the risk, and were relied on by the insurer. *Ætna Life Ins. Co. v. Rehlaender*, 68 Neb. 284. When the question of concealment of material facts is sought to be interposed to avoid liability of a life insurance policy, such question of concealment is one of fact for submission to the jury. Bliss, Life Insurance (2d ed.) sec. 384.

The question whether the insured made false answers and whether she and the beneficiary, or either of them, concealed material facts from the defendant, upon which it relied, was properly submitted to the jury under the instructions of the court.

The verdict seems to be supported by the evidence. Finding no reversible error, the judgment is

AFFIRMED.

LETTON and ALDRICH, JJ., not sitting.